UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JERIEL D. WADSWORTH,

        Plaintiff,                          Civil Action No. 10-cv-11216

      v.                                District Judge Julian Abele Cook
                                        Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 12]**

       Plaintiff Jeriel D. Wadsworth brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, and his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. Both parties filed summary judgment motions (Dkts. 9, 12) which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I. RECOMMENDATION**

       For the reasons set forth below, this Court finds that the ALJ properly dealt with the medical evidence, including the two-page record from Psychologist Gary C. Struck, MSW, and properly established that the Vocational Expert's testimony was consistent with the Dictionary of Occupational Titles. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## II. REPORT

### A. Procedural History

Plaintiff alleges that he became unable to work on February 28, 2008. (Tr. 35.) The Commissioner disapproved Plaintiff's disability application on June 9, 2008. (Tr. 42-49.) He then filed a timely request for a hearing, and on July 21, 2009, Plaintiff appeared with counsel before Administrative Law Judge ("ALJ") James P. Alderisio, who considered the case *de novo*. (Tr. 7.) In an October 28, 2009 decision, the ALJ found that Plaintiff was not disabled. (Tr. 30-41.) The ALJ's decision became the final decision of the Commissioner on February 3, 2010, when the Appeals Council denied Plaintiff's request for review. (Tr. 1-3.) Plaintiff filed this suit on March 26, 2010.

### B. Background

Plaintiff was 39 years old at the time of the ALJ's decision. (Tr. 30,39.)[1] He has a General Equivalency Diploma (GED). (Tr. 39.) He has past relevant work as a nurse's aide.[2] (Tr. 39.) Plaintiff's alleged disability includes the following conditions: diabetes mellitus, peripheral neuropathy, dyslexia, anxiety, and depression. (Tr. 35.)

---

[1] The regulations consider Plaintiff to be "a younger individual age 18-49." *See* 20 C.F.R. § 404.1563(d). The standard for disability under both the DIB and SSI programs is virtually identical. Therefore, except where otherwise necessary, the remainder of this Report and Recommendation will refer only to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599. The parallel SSI regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB cites (e.g., 20 C.F.R. § 404.1503 corresponds with 20 C.F.R. § 416.903).

[2] Plaintiff last worked as a nurse's aide in July of 2003. (Tr. 155.)

### 1. *Plaintiff's Testimony*

At the July 21, 2009 hearing before the ALJ, Plaintiff testified regarding his dyslexia, diabetes, anger, and aggression. (Tr. 11-16, 22.) Regarding his dyslexia, Plaintiff explained that he does not have a driver's license, and never applied for one because of the reading test. (Tr. 12.) As for his diabetes, he testified that he has been a diabetic for fifteen years. (Tr. 13.) He claimed that his diabetes is not controlled by medication. (Tr. 13.) He also claimed to have eye problems as a result of this diabetes. (Tr. 14.) Specifically, he has blurry and double vision. (Tr. 15.) Lastly, Plaintiff briefly testified that he took Trazodone to control his anger and aggression. (Tr. 22.)

### 2. *Medical Evidence*

Plaintiff's school records indicate poor performance in learning disabled classes from 1985 through 1988. (Tr. 181-82.) Further, his most recent documented IQ tests indicate a Verbal Score of 75 and a full scale score of 77. (Tr. 184.)

In addition, Plaintiff has numerous records from Detroit Receiving Hospital, Sinai Grace Hospital, and Harper Hospital reflecting a multitude of hospitalizations and emergency room visits since as early as 2002. (Tr. 42.) With regard to Plaintiff's physical conditions – diabetes mellitus, peripheral neuropathy – Plaintiff has been to the emergency rooms of these hospitals on several occasions for pain in his legs and feet and insulin injections. (Tr. 185-87, 192-93, 194-95.)

Plaintiff has also visited these hospitals in an attempt to procure vicodin. (Tr. 199-200.) The records indicate that Plaintiff has a history of "noncompliance with his medication for diabetes and narcotic seeking behavior." (Tr. 196.)

Plaintiff has also visited these hospitals to deal with issues regarding abuse of alcohol,

cocaine, and marijuana. (Tr. 237, 249.) On one occasion, Plaintiff presented to the emergency room at Sinai-Grace for "2 days of nausea and vomiting." (Tr. 237.) At that time, Plaintiff admitted to drinking "7 cans of beer a day"despite his diabetes and neuropathy. (Tr. 237.) As early as 2002, Plaintiff told the doctors at Sinai-Grace that he needed "some help for his substance abuse." (Tr. 249.) At that time, he tested positive for alcohol and drugs, and stated that he used cocaine and marijuana. (Tr. 249.)

Lastly, Plaintiff has visited these emergency rooms in connection with some criminal behavior. On June 17, 2003, Plaintiff presented to the emergency room at Sinai-Grace with stab wounds. (Tr. 254.) These wounds required follow-up including irrigation. (Tr. 263.) In addition, on June 27, 2007, Plaintiff presented to the emergency room in the custody of the Detroit Police Department.[3] (Tr. 194-95.)

Despite these physical impairments and substance abuse issues, Plaintiff's primary issue for this judicial review pertains to his mental impairments. (Pl.'s Mot. Summ. J. at 9.)

On February 17, 2008, Plaintiff presented to Sinai-Grace's emergency room with neuropathic pain. (Tr. 299.) However, at intake, he said he was having "suicidal thoughts." (Tr. 299.) Subsequently, at the Psychiatry Intake and Emergency Department he told a social worker that "he had never been formally diagnosed with any mental illness or taken any psych meds, but was told at Detroit Central City that he might have bipolar disorder." (Tr. 299.) The Intake Social Worker checked the following "clinician findings" on a standard intake form: 1) Suicide ideation; 2) Depressed mood, psychomotor agitation; 3) Social Withdrawal; 4) Substance abuse; 5) Positive/abnormal drug screen/alcohol screen; 6) Somatic Preoccupation; and 7) Severe impairment

---

[3] Plaintiff has been arrested many times and has spent time in prison. (Tr. 319-23.)

4

in familial, vocational or educational functioning. (Tr. 302.)

On February 28, 2008, Plaintiff presented again to Sinai-Grace's Psychiatry Intake and Emergency Department feeling "sad and angry." (Tr. 283.) At that time, the social worker performing the intake checked the following "clinician findings" on the standard intake form: 1) Hallucinations; 2) Severe agitation, anxiety, panic; 3) Depressed mood, psychomotor agitation; 4) Social Withdrawal; 5) Appetite/sleep disturbance; and 6) Severe impairment in familial, vocational or educational functioning. (Tr. 286.)

Plaintiff did not seek consistent treatment for his mental impairments. The records show that his next appointment was on March 10, 2008, when he visited Dr. Sung-Ran Cho, M.D. of the Disability Determination Service ("DDS"). (Tr. 319-23). At that appointment, Plaintiff reiterated his personal history including details relating to his children, alcohol abuse, and jail time. (Tr. 320.) He also told Dr. Cho that he was homeless, and "did not get along with any one and argued with every body." (Tr. 320.) He also indicated that, "[h]e felt angry because he missed his mother" and "heard voices telling him at night that he was 'nothing' and people did not like him." (Tr. 321.) He denied any suicidal or homicidal intentions. (Tr. 321.) Dr. Cho diagnosed him with: 1) Intermittent Explosive Disorder; 2) Alcohol and Cannabis dependence, in sustained remission, according to self report; and 3) Antisocial personality disorder.

(Tr. 322.) She gave him a GAF score of 50,[4] and stated his prognosis was poor.[5] (Tr. 322.)

On April 21, 2008, Dr. Zahra Khademian reviewed Plaintiff's medical records for the state DDS, and completed the Psychiatric Review Technique and Mental Residual Capacity Assessment forms. (Tr. 324-40.) Dr. Khademian determined that Plaintiff had a history of a learning disability, depression, and substance abuse "in remission." (Tr. 329, 331, 336.) Regarding the B criteria, Dr. Khademian found that Plaintiff had a moderate limitation in the ability to carry out detailed instructions and the ability to maintain attention and concentration for extended periods. (Tr. 324.) Dr. Khademian also found a moderate limitation in maintaining concentration, persistence, or pace. (Tr. 325.) Dr. Khadenian found no episodes of decompensation. (Tr. 338.) Dr. Khademian stated that Plaintiff retained the ability to do "simple unskilled tasks in [sic] regular basis at this point." (Tr. 326.)

On October 12, 2008, Plaintiff presented to the Sinai-Grace emergency room again. (Tr. 370.) At that time he reported "auditory hallucinations telling him to kill himself, and telling him to hurt others." (Tr. 370.) He reported his plan "would be to set himself on fire." (Tr. 370.) At that point, the emergency room physician diagnosed Plaintiff with "acute exacerbation of psychiatric

---

[4] A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 30-34 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id*. at 32. A GAF of 41 to 50 means that the patient has "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*. A GAF of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

[5] Notably, on March 18, 2008, "a man" called Dr. Cho "claiming he was the examiner named Mr. Robinson, working for the disability determination service for [the] social security administration." (Tr. 323.) He requested "immediate information" regarding Jeriel Wadsworth. (Tr. 323.) Dr. Cho's office asked the man for his return phone number. (Tr. 323.) The return phone number was Plaintiff's. (Tr. 323.)

disorder" and "cocaine abuse." (Tr. 370.)

On November 11, 2008, Plaintiff presented to the Sinai-Grace emergency room again stating that he "has had a headache for the last several years," and he hears voices telling him to kill himself. (Tr. 373.) He was again diagnosed with "acute psychiatric disturbance." (Tr. 373.) He refused to provide a "urine specimen for analysis or drug screen." (Tr. 375.)

Plaintiff saw physicians and social workers at Lincoln Behavior Services on March 13, 2008, July 30, 2008, August 15, 2008, and November 21, 2008. (Tr. 383-91.) His provisional diagnosis from Lincoln Behavioral Services was bipolar disorder with poor anger control and anxiety attacks. (Tr. 384.)

On March 9, 2009, Plaintiff saw Psychiatrist Someswra N. Navuluri at the Detroit East, Inc. Community Mental Health Center. (Tr. 393.) Dr. Navuluri noted, "[a]lcohol and drug abuse has been decreasing but still present. Medically stable." (Tr. 393.) Dr. Navului also noted that, "during the interview, patient was alert, cooperative, and appropriate. Not psychotic. Not violent. Judgment was adequate." (Tr. 393.)

Lastly, on May 1, 2009, Psychologist Gary C. Struck completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) for Plaintiff. (Tr. 394-95). Struck rated Plaintiff as "poor" on an number of items regarding Plaintiff's ability to perform work-related activities. (Tr. 394-95.)

### 3. *Vocational Expert's Testimony*

Vocational Expert ("VE") Anette Holder testified at the hearing. The ALJ asked the VE to assume the following hypothetical individual:

> Suppose I had an individual that could work at the light level with the following restrictions: the jobs would be no stereoscopic vision jobs,

> there'd be no exposure to hazardous machinery. The jobs would be
> simple one or two-step instruction jobs; low-stress; no contact with
> the public; limited but satisfactory in dealing with supervisors.

(Tr. 17.) The VE testified that there would be no jobs for such a person. (Tr. 18.) The ALJ then asked the VE to consider a person with all the above limitations except the stereoscopic vision deficit. (Tr. 19.) The VE testified that such a person could work as a packer, sorter, and cleaner, and that there would be 1,500, 1,200, and 4,800 such jobs available in the region respectively. (Tr. 19-20.)

### C. Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to
> last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment

meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The Administrative Law Judge's Findings[6]

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since February 28, 2008 — Plaintiff's alleged onset date. (Tr. 35.) At step two, the ALJ found that Plaintiff had the following severe impairments: diabetes mellitus, peripheral neuropathy, dyslexia, anxiety, and bipolar disorder. (Tr. 35.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 36.) In examining the B criteria associated with mental impairments, *see* 20 C.F.R. pt. 404, subpt. P, app'x 1, § 12.04, the ALJ found that Plaintiff had mild restrictions in daily living, moderate difficulties in both social function and concentration, persistence, and pace, and no episodes of decompensation of extended

---

[6] In the "Applicable Law" section of his decision, the ALJ points out: "Public Law 104-121 enacted March 29, 1996 prohibits the payment of benefits to title II and XVI disability [sic] for which drug abuse or alcoholism is a contributing factor material to the determination of disability." (Tr. 35.) However, the ALJ does not address Plaintiff's drug abuse or alcoholism any further in this decision. In addition, neither Plaintiff nor Defendant raise the issue in their briefs.

duration. (*Id.*) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform light work as qualified by a significant number of additional limitations. (Tr. 37.) At step four, the ALJ found that Plaintiff could not perform his past relevant work as a nurse's aide. (Tr. 39.) At step five, the ALJ relied on VE testimony in response to his hypothetical, and found that work existed in significant numbers that Plaintiff could perform. (Tr. 39.) These jobs include packer, sorter, and cleaner for which there were 1,500, 1,200, and 4,800 jobs available in the region, respectively. (Tr. 40.) The ALJ also stated that "[p]ursuant to SSR 00-4p, the vocational expert's testimony [was] consistent with the information contained in the Dictionary of Occupational Titles." (Tr. 40.) Therefore, the ALJ found Plaintiff "not disabled." (Tr. 40.)

### E. Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v.*

*Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

**F. Analysis**

Plaintiff's allegations of error are narrow. Plaintiff argues that the ALJ failed to give Psychologist Gary Stuck's opinion regarding Plaintiff's mental health proper deference, and failed to follow the procedural requirements for rejecting a treating source opinion. (Pl.'s Mot. Summ. J. at 9-10.) The Plaintiff also argues that the ALJ failed to establish that the VE's testimony was consistent with the Dictionary of Occupational Titles. (*Id*. at 10-11.) For the reasons stated below, the Court finds that both arguments fail.

*1. The ALJ Was Not Required To Give Deference To The  Opinion of Gary Stuck*

In assessing the medical evidence supporting a claim for disability benefits, an ALJ must apply the "treating physician rule:" an ALJ must generally give greater deference to the opinions of treating physicians than to those of non-treating physicians. *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010); *see also* 20 C.F.R. § 404.1527; SSR 96-2p. Therefore, it is critical to properly identify a plaintiff's treating physician. This is the primary dispute in this case.

Plaintiff contends that the ALJ erred by failing to treat the opinion of Gary Stuck as a treating source opinion. (Pl.'s Mot. Summ. J., at 10.) Defendant responds that Stuck is not a treating source because he – at most – saw Plaintiff only once, and did not report any treatment in that one visit. (Def. Mot. Summ. J., at 10-11.)

A treating physician is defined by the regulations as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you with medical treatment or evaluation and *who has, or has had, an ongoing treatment relationship with you*." 20 C.F.R. §

404.1502 (emphasis added). Notably, the Sixth Circuit has held that a medical source cannot be a treating source after only one visit. *Kornecky v. Comm'r Soc. Sec.*, 167 F. App'x. 496, 506-07 (6th Cir. 2006). As the *Kornecky* Court explained:

> "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once . . . ." *Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994)* ("Dr. Ruff examined Mr. Barker on only one occasion, and the rationale of the treating physician doctrine simply does not apply here.").
>
> [Plaintiff] cites no authority where a federal court has found a source to be a treating source after only one visit. However, a plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship. *See, e.g., White v. Barnhart, 415 F.3d 654, 658 (7th Cir. 2005)* (occupational medicine specialist who evaluated claimant only once was not a treating physician). Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship. *See, e.g., Cunningham v. Shalala, 880 F. Supp. 537, 551 (N.D. Ill. 1995)* (where physician saw claimant five times in two years, it was "hardly a foregone conclusion" that his opinion should be afforded great weight).

*Id.* at 506-07.

The record here supports that Gary Stuck is not Plaintiff's treating source. The entirety of Plaintiff's "relationship" with Stuck consists of one visit, in which Stuck completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)." (Tr. 394-95.) In this brief two-page "Medical Source Statement," Stuck does not indicate he gave Plaintiff any sort of treatment. (Tr. 394-95.) It is also clear from the record that Stuck did not have any type of "ongoing treatment relationship" with Plaintiff. (*Id.*) There is no mention of examination dates, actual treatment notes or reports or records of any clinical findings. Given the long history of Plaintiff's

13

mental difficulties, a single examination cannot suffice to render Stuck a treating source. *Kornecky*, 167 F. App'x. at 506.

Plaintiff relies on *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004) for the proposition that the ALJ committed reversible error by failing to articulate his reasons for rejecting Stuck's opinion. (Pl.'s Mot. Summ. J., at 9.) This reliance is misplaced.

In *Wilson*, the Sixth Circuit stated: "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" 378 F.3d at 544 (quoting 20 C.F.R. § 404.1527(d)(2)). And even where the ALJ finds that a treating physician's opinion is not entitled to controlling weight, he must give specific reasons for the weight given to the treating source's medical opinion. *Id*; 20 C.F.R. § 404.1527.

The record in this case suggests that t there is no treating physician for Plaintiff's mental impairments. Plaintiff visited at least nine different physicians, attending physicians, social workers, psychiatrists or psychologists for his mental impairments. (Tr. 299-395.) None of these individuals had an "on-going" relationship with Plaintiff as required by the regulation. Thus, the ALJ neither misstated nor ignored a treating physician's opinion.

The closest Plaintiff gets to "treating" sources are the individuals he saw at Lincoln Behavioral Services. (Tr. 383-91.) The record seems to indicate that Plaintiff saw one social worker on at least three of these visits. (Tr. 383-91.) The ALJ considered this source. (Tr. 38.) Indeed, he quotes from the Lincoln Behavior Services records in his decision: "The evidence also indicates that the claimant has been diagnosed with bipolar disorder and poor anger control, as well as anxiety attacks." (Tr. 38.)

14

In short, the opinion of Gary Stuck is not a treating source opinion. As such, the ALJ did not owe the opinion controlling weight. 20 C.F.R. § 404.1502. Nor did he have to explain why he did not explicitly address the shortcomings in the opinion. *Kornecky*, 167 F. App'x. at 507-08. As the Sixth Circuit has stated: "While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each medical opinion, it is well settled that 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" *See id.* (citation omitted). The ALJ's opinion makes clear that he considered the record evidence pertaining to Plaintiff's mental impairments and structured his residual functional capacity analysis accordingly. (Tr., 38-39.) As such, any failure to specifically reference MSW Stuck's opinion is not error.

### 2. The ALJ Established that the VE's Testimony was Consistent with the Dictionary of Occupational Titles.

Social Security Ruling 00-4p requires an ALJ to "resolve any conflicts between a VE's testimony regarding jobs that a claimant can perform and the DOT's description of what is required to perform the jobs identified:"

> When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . . At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency. Neither the DOT nor the VE . . . evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information.

SSR 00-4p (2000). *See* WL 1898704 at *3-*4 (S.S.A.).

Under this rule, the ALJ must determine if there is a conflict between the VE's testimony and

15

the DOT's job descriptions. SSR 00-4p (2000). *See* WL 1898704 at *3-*4 (S.S.A.). "In an effort to insure that such actual or apparent conflicts are addressed, the Social Security Administration has imposed an affirmative duty on ALJs to ask the VE if the evidence that he or she has provided 'conflicts with [the] information provided in the DOT.'" *Lindsley v. Comm'r Soc. Sec.*, 560 F.3d 601, 603 (6th Cir. 2009) (citations omitted). Then, if indeed there is a conflict, the ALJ must obtain a reasonable explanation of the conflict. SSR 00-4p (2000). *See* WL 1898704 at *3-*4 (S.S.A.).

Here, the ALJ asked the VE to assume the following hypothetical individual that could work at the light level with the following restrictions: 1) No exposure to hazardous machinery; 2) Nothing beyond simple one or two-step instructions; 3) No contact with the public; and 4) Limited but satisfactory ability to deal with supervisors. (Tr. 17-19.)

The VE testified that such a person could work as a packer, sorter, and cleaner. (Tr. 19-20.) The ALJ did not ask the VE if these jobs conflicted with the information provided in the DOT. (Tr. 17-19.) The ALJ was, however, clearly cognizant of the relevant rule. (Tr. 40.) At the end of his decision, he explicitly stated: "Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (Tr. 40.) An analysis of the VE's testimony in comparison to the DOT information proves this to be true.

The DOT describes the job of "packer" as "Light Work" with no exposure to moving parts. DOT 753.687-010, 1991 WL 680982. In addition, the DOT states that the job of "packer" has a Level 2 "Specific Vocational Preparation" ("SVP"), meaning the job does not require "[a]nything beyond a short demonstration up to and including one month to learn." *Id*. The DOT also states that the degree of involvement with people is "not significant." *Id*.

The DOT describes the job of "sorter" as "Light Work" with no exposure to moving parts.

16

DOT 753.687-010, 1991 WL 680340. The DOT also states that the job of "sorter" has a Level 2 SPV, and that the degree of involvement with people is "not significant." *Id*.

The DOT describes the job of "cleaner" as "Light Work" with no exposure to moving parts. DOT 704.687.010, 1991 WL 678987. The SPV is Level 2, and the degree of involvement with people is "not significant." *Id*.

All these DOT definitions are consistent with the VE's testimony regarding the ALJ's hypothetical. Each job has a strength listing of "Light Work," which matches the ALJ's RFC findings. DOT 753.687-010, 1991 WL 680982; DOT 753.687-010, 1991 WL 680340; DOT 704.687.010, 1991 WL 678987. Each job has limited exposure to moving parts, a Level 2 SPV, and a degree of involvement with people that is not significant. *Id*. Moreover, the Plaintiff has failed to specifically identify any inconsistency between the VE testimony and the DOT definitions. (Pl.'s Mot. Summ. J., at 10-11.) As such, any error on the part of the ALJ in failing to affirmatively ask the VE if her testimony conflicted with the DOT was harmless. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)). Again, as the ALJ stated in his opinion, "[p]ursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (Tr. 40.)

### G. Conclusion

For the foregoing reasons, this Court finds that the ALJ properly considered all the medical evidence, including the records from Psychologist Gary C. Struck, MSW, and properly established

17

that the Vocational Expert's testimony was consistent with the Dictionary of Occupational Titles. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

### III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. A copy of any objections is to be served upon this magistrate judge. E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

                                              s/Laurie J. Michelson
                                              LAURIE J. MICHELSON
                                              UNITED STATES MAGISTRATE JUDGE

Dated: May 18, 2011

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on May 18, 2011.

                                              s/Jane Johnson
                                              Deputy Clerk